E-Filed: 04.19.11

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. CR 08-00828 MMM |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER DENYING DEFENDANT'S MOTION TO PRECLUDE TESTIMONY AND STRIKE ALLEGATIONS |
| | ) | |
| DENNIS McKENZIE, | ) ) | |
| Defendant. | ) ) ) | |

On January 8, 2010, the grand jury returned a second superseding indictment charging defendant Dennis McKenzie with five counts of distributing a mixture or substance containing cocaine base in the form of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841 (b)(1)(B)(iii).[1]  On January 25, 2010, McKenzie moved to exclude trial testimony related to count three, which alleges that he distributed a mixture or substance containing cocaine base in the form

---

[1]Second Superseding Indictment, Docket No.44 (Jan. 8, 2010).  McKenzie was initially indicted on the first four counts on July 15, 2008.  (Indictment, Docket No. 1 (July 15, 2008).) The fifth count was added in a first superseding indictment on December 11, 2009.  In the first two indictments, count three charged that McKenzie had "knowingly and intelligently distributed *five grams* or more, that is, approximately *54.3 grams* of . . . crack cocaine."  (First Superseding Indictment, Docket No. 37 (Dec. 11, 2009) (emphasis added).)  To correct this, the grand jury returned a second superseding indictment on January 8, 2010, which modified count three to read: "*fifty* grams or more, that is, approximately 54.3 grams," of a mixture or substance containing cocaine base in the form of crack cocaine.

of crack cocaine that weighed more than fifty grams.  McKenzie also sought to strike allegations in count three that the substance in question weighed more than fifty grams.[2]  The government opposed both motions.[3]

McKenzie asked that the court conduct an evidentiary hearing under Rule 702, Rule 104 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to test the reliability of the opinions that government expert, Todd H. Davis, intended to offer at trial regarding the weight of the drugs at issue in count three.  At a hearing on February 16, 2010, the court instructed the government to file supplemental briefing regarding defendant's *Daubert* challenge. The government complied on February 26, 2010,[4] and defendant filed a supplemental reply on March 3, 2010.[5]  On March 5, 2010, the court granted defendant's request for a *Daubert* hearing.[6] At that hearing, Davis and defense expert Dr. John Treuting testified regarding the weight of the drugs.

## I.  FACTUAL BACKGROUND

This action arose out of an investigation conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") regarding drug trafficking activity in the Baldwin Village area

---

[2]Pretrial Motion to Preclude Testimony ("Motion"), Docket No. 56 (Jan. 25, 2010); Declaration of Alan Eisner in Support of Motion to Preclude ("Eisner Decl."); see also Reply to Government's Opposition to Pretrial Motion to Preclude Testimony ("Reply"), Docket No. 61 (Feb. 8, 2010).

[3]Opposition to Defendant's Pretrial Motion to Preclude Testimony ("Opposition"), Docket No. 59 (Feb. 1, 2010).

[4]Supplemental Opposition to Defendant's Pretrial Motion to Preclude Testimony ("Supp. Opp."), Docket No. 65 (Feb. 24, 2010).

[5]Supplemental Reply to Government's Opposition ("Supp. Reply"); Declaration of John Treuting ("Treuting Decl."), Docket No. 67 (March 3, 2010).

[6]Order Granting Defendant's Request for a *Daubert* Hearing, Docket No. 68 (March 5, 2010).

of Los Angeles.[7]   The government alleges that on five separate dates in 2008, McKenzie sold crack cocaine in various quantities to a confidential informant ("CI"): (1) 13.3 grams on May 22; (2) 26.6 grams on May 23; (3) 54.3 grams on May 28; (4) 22.6 grams on July 1; and (5) 23.7 grams on July 22.[8]

The sale of 54.3 grams on May 28, 2008 is alleged in count three of the second superseding indictment.[9]   The government asserts that on that date, the CI asked McKenzie the price of "two," meaning two ounces of crack cocaine or 56.69 grams.[10]   In exchange for $1,100, McKenzie allegedly delivered two baggies containing crack cocaine to the CI.[11]

Directly after the sale, the CI gave the two baggies to ATF Agent Hercules Fandino, who booked the suspected crack cocaine into evidence at the ATF's Los Angeles field office the next day, and labeled it Exhibit 10.[12]   Fandino also measured the evidence, and determined that its approximate weight, including the baggies holding the narcotics, was 55.9 grams.[13]   On June 10, 2008, Fandino sent Exhibit 10 to the Drug Enforcement Administration's ("DEA") Southwest Laboratory in Vista, California for further testing.[14]

On July 8, 2008, DEA forensic chemist Todd Davis analyzed Exhibit 10, and concluded

---

[7]Opp. at 3.

[8]*Id.*

[9]Second Superseding Indictment at 3.

[10]See Declaration of Hercules Fandino in Support of Government's Opposition ("Fandino Decl."), Docket No. 67 (March 3, 2010), ¶ 3.

[11]*Id.*; Eisner Decl., Exh. B (photographs of the alleged crack including its measurement).

[12]Fandino Decl., ¶¶ 3–4.  ATF procedure requires that narcotics evidence be checked into a temporary evidence vault within twenty-four hours of seizure. (*Id.* ¶ 4.)

[13]*Id.*, ¶ 3.

[14]*Id.*, ¶ 5.

that it was cocaine base of 35 percent purity with a total net weight of 54.3 grams.[15]   In his declaration, Davis describes the process he used to weigh the narcotics.[16]   Using a Mettler Toledo balance, he began by weighing the entire exhibit, including the heat-sealed envelope in which it arrived.[17]   He then removed the narcotics from the bag and examined them.   He determined that they were not too wet or otherwise in a condition that prevented them from being tested.[18]   Davis next used a second Mettler Toledo balance to weigh two unused ziplock bags.[19]   After placing the narcotics in these bags, Davis weighed each bag separately on the second balance with the

---

[15]Davis Decl, Exh. C (DEA Laboratory Report).   Citing the notes Davis prepared to detail his analysis of Exhibit 10 and two other exhibits, defense counsel noted that Davis had not listed a specific date on which he had opened Exhibit 10, although he had noted the date opened for the other two exhibits as July 8.   (*Id.*, Exh. B.)   Davis testified that he did not need to identify a separate date for each exhibit, and that all three exhibits had been opened on July 8, 2008, although he could not recall the order in which he had analyzed them.   Defense counsel also noted that the dates listed under "date reported" and "dated sealed" had both been changed from July 10, 2008 to July 11, 2008. (*Id.*)   While Davis could not recall why he had initially recorded July 10, 2008, he testified that the alteration was made to reflect the correct date of July 11, 2008.

[16]*Id.*, ¶ 4.

[17]*Id.*, ¶ 4(a).   Davis determined that the "gross weight" of Exhibit 10 including the evidence envelope was 82.9 grams.   (*Id.*)   He stated that the balances used at the DEA lab are checked on a monthly basis by a DEA balance calibration monitor and taken out of service if there are any problems.   (*Id.*, ¶ 4(b).)   He also noted that an outside company performs a yearly calibration performance examination of all of the balances at the DEA lab.   (*Id.*)   Davis reported that none of the balances used to weigh Exhibit 10 have been found to have a problem.   (*Id.*)   At oral argument, Davis testified that he normally checks to make sure that any balance he uses has a zero reading before weighing any exhibits, and adjusts the balance to such zero if it does not.   Davis could not recall specifically whether he had made such an adjustment on July 8, 2008.

[18]*Id.*, ¶ 4(c).   Citing notes Davis prepared regarding Exhibit 17, defense counsel observed that Davis found that the exhibit was wet and allowed it to dry for at least two hours before reweighing it.   (See Eisner Decl., Exh. L.)

[19]*Id.*, ¶ 4(d).   Davis found that the two empty bags weighed .620 grams and .635 grams respectively.   (*Id.*)   At the hearing, Davis testified that he used separate balances to determine the gross weight and net weight, stating that the balance used to determine net weight is specifically designed to measure low-weight objects.

narcotics inside.[20]  He then subtracted the weight of the bags when empty from the weight of the bags when filled, and determined that the "net weight" of the narcotics comprising Exhibit 10 was 54.332 grams.[21]  Based on his training, experience, and discussions with other DEA personnel, Davis states that the procedure he used is the method most commonly used by DEA forensic chemists to establish the net weight of narcotics exhibits.[22]  He testified that based on DEA formulas used to identify the rate of uncertainty for any calculation, the potential rate of uncertainty for his calculation of the net weight of Exhibit 10 is $+/-$ 0.01 grams.[23]

Davis stated that he then took small portions of narcotics from each of the bags and used them to perform nine tests confirming the composition of the narcotics.[24]  He did not weigh the amount of narcotics he removed from each bag.  After performing the first two tests on two

---

[20]*Id.*, ¶ 4(e).  Davis found that the two bags weighed 28.119 grams and 27.468 grams respectively when containing the narcotics. (*Id.*)

[21]*Id.*, ¶ 4(f).

[22]*Id.*, ¶ 4(g).

[23]Supplemental Declaration of Todd H. Davis ("Supp. Davis Decl."), Docket No. 66 (Feb. 26, 2010), ¶ 4.

[24]*Id.* ¶ 5.  In his supplemental declaration, Davis estimated that he (1) used 20 milligrams from each bag (40 milligrams total) to perform a chromatography mass spectrometer test; (2) used approximately 20 milligrams from each bag (40 milligrams total) to apply a color test solution; (3) ground the two portions of Exhibit 10 together, and passed the narcotics through a small screen, removing particles that were too large to fit through the screen; (4) removed approximately 1 gram from the now combined Exhibit 10 to test with an infrared spectrometer; (5) used a portion from the prior test and possibly an additional portion from Exhibit 10 to perform a methanol wash; (6) used approximately 500 milligrams to perform a uranyl acetate test; (7) used approximately 20 milligrams to perform a gas chromatography test; (8) used approximately 20 milligrams to conduct another chromatography mass spectrometer test; and (9) used approximately 120 milligrams to conduct a quantitative test to determine the amount of pure cocaine in the exhibit. (*Id.*)  In total, therefore, Davis estimated that he used roughly 1.74 grams to perform the tests.  At the hearing, however, Davis testified that this was a "low-ball estimate" of the amounts used, explaining that these were just the minimum amounts needed to perform each test and that he did not measure the exact amounts taken for each test.  Davis also stated that some material was lost during the third step in the process because it became stuck in the screen used. (See *id.*, Exh. B.)

separate samples, Davis determined that both contained cocaine.[25]  He then ground the narcotics in each bag with a mortar and pestle, passed the material through a small screen, and combined the narcotics together.[26]  As mentioned in Davis' notes and discussed at the hearing, some portion of the narcotics became stuck in the screen and was not returned to the exhibit; it was therefore not included in the reserve weight that Davis calculated at the conclusion of his testing.[27]  After completing seven additional tests on the narcotics, Davis used the same procedure he had used at the beginning of the process to reweigh the narcotics; he weighed one new ziplock bag, weighed the narcotics in the bag, and subtracted the weight of the bag from the total weight.  He determined that the "reserve weight" of Exhibit 10 was 50.46 grams.[28]  After completing a lab report detailing his results,[29] Davis' work was reviewed and approved by his supervisor.[30]

On August 13, 2009, the court entered a stipulated order permitting defendant to reweigh Exhibit 10.[31]  In the presence of Davis and ATF Special Agent Daniel Thompson, Dr. John Treuting weighed Exhibit 10 on September 21, 2009, and determined that it had a net weight of 46.56 grams.[32]  Treuting used a methodology similar to that Davis employed.  Treuting first weighed Exhibit 10 in its original packaging.  He then weighed empty new packaging, weighed the narcotics inside the new packaging, and weighed the original packaging without the narcotics.[33]

---

[25]*Id.*, ¶ 5(a)–(b).

[26]*Id.* ¶ 5(c).

[27]*Id.*, Exh. B.

[28]*Id.*, ¶ 6.  It thus appears that approximately 3.9 grams of the evidence was used or lost during testing.

[29]*Id.*, Exh. C.

[30]*Id.*, ¶ 5(j).

[31]Order Allowing Defendant to Reweigh Drug Exhibit, Docket No. 32 (Aug. 13, 2009).

[32]Treuting Decl., ¶ 2.

[33]See Eisner Decl., Exh. G (Pacific Toxicology Laboratories, Inc. Gravimetic Analysis)

1   Based on these measurements, Treuting calculated the net weight of the drugs in two ways: (1)
2   by deducting the weight of the new packaging when empty from its weight with the narcotics; and
3   (2) by deducting the weight of the original packaging when empty from the weight of the original
4   packaging with the narcotics.[34]   Based on Treuting's measurements, Davis separately calculated
5   that the net weight Exhibit 10 on September 21, 2009 was 46.538 grams.[35]   The parties thus
6   concur that the weight of the drugs had decreased by 3.9 grams since Davis' measurement of the
7   reserve weight following testing in July 2008.

8       Davis' notes concerning the reweighing state that he saw a brown stain and moisture on
9   the inside of the container holding the evidence.[36]   Dr. Treuting did not observe moisture in the
10   container.[37]   Although Davis and Treuting signed each other's worksheets confirming their
11   respective weight calculations, Treuting did not review Davis' description of the evidence
12   container, which was on the reverse side of the page containing Davis' weight calculation.[38]

13       Based on his training and experience, Davis asserts that he was not surprised that the
14   weight of Exhibit 10 had decreased over the fourteen months between his weighing of the
15   narcotics in July 2008 and its reweighing on September 21, 2009.[39]   Davis notes that crack cocaine
16   is made by mixing water with cocaine base, and that the weight of the drug can decrease over time
17   as the water evaporates.[40]   At the hearing, Davis testified that Exhibit 10 had been stored at room

18

19       [34]*Id.*

20       [35]Davis Decl. , ¶ 8(b).  Davis used the same weighing procedures he used on July 11,
21   2008. (*Id.*)

22       [36]*Id.*, ¶ 9.

23       [37]Treuting Decl., ¶ 7.

24       [38]*Id.*, ¶ 8(c).  At the hearing, Davis stated that he could still see a brown stain on the
25   evidence bag.  Treuting testified, however, that he could not see such a "stain," and that any
26   discoloration might simply be the result of heat sealing the evidence bag.

27       [39]Davis Decl., Exh. D.

28       [40]*Id.*, ¶ 9.

7

temperature, and that the decrease in weight was likely due to evaporation of the water in the narcotics.  He contends that this is an accepted principle in the forensic community,[41] citing an article regarding the potential for evaporation of water in crack cocaine over time that was published in a peer-reviewed journal by the DEA's foremost expert on cocaine.[42]  Davis asserts that this explanation of the decrease in the weight of the drugs is supported by his observation at the time of the reweighing that the inside of the container holding Exhibit 10 had moisture and a brown stain.**[43]**

Dr. Treuting conceded at the hearing that crack cocaine can lose weight over time due to water evaporation.  He asserts, however, that based on his experience, "it would be unusual for an approximately 50 gram amount of crack cocaine to lose 3.9 grams over 14 months while in a sealed evidence container."[44]  Treuting notes that the percentage decrease in the weight of Exhibit 10 was greater than the decreases discussed in the study Davis proffers.[45]  He also maintains that he saw no evidence of moisture or a stain on the evidence container when Exhibit 10 was

---

[41]Supp. Davis Decl., ¶ 4.

[42]*Id.*, Exh. E (Laura M. Jones, Danielle K. Boudreau, and John Casale, *"Crack Cocaine": A Study of Stability over Time and Temperature*, 6 MICROGRAM JOURNAL, Numbers 3–4 (2008)).

[43]*Id.*, ¶ 9.

[44]Treuting Decl., ¶ 4.

[45]*Id.*, ¶ 11.  ("The study demonstrates that over a 12 month period, there was a 2.1% weight loss of a freshly prepared sample when stored at room temperature in a heat sealed evidence envelope. . . .  The percentage weight loss of exhibit 10 was 7.6%, well over three times the weight loss of the contraband stored in similar conditions for a similar period of time in the study").  The study states that "[w]eight losses were highest for samples stored at room temperature, with a 2–5% loss after 12 months." (Davis Decl., Exh. E at 117.)  Thus, although Dr. Treuting cites the low end of the range of weight loss documented by the study, it appears clear that Exhibit 10 lost more weight than the samples involved in the study.  The court notes, however, that Exhibit 10 contained 35% cocaine, while the samples used to conduct the study contained 85.7% to 86.9% cocaine.  (*Id.*)  The report states that "[b]ecause the 'crack' samples that were prepared for the 12 month experiments were uniform, of reasonably high purity, and contained little/no sodium bicarbonate and only incidental moisture, this study gives a 'best case' scenario for stability and weight loss. . . .  Illicitly prepared 'crack' samples typically vary widely in their composition, and therefore are unsuited for a study of this type." (*Id.* at 16.)

reweighed.[46]  Based on a review of Davis' notes and records, Dr. Treuting asserts that Davis failed to account for 2.2 grams of the narcotics following his testing of Exhibit 10.[47]  He testified at the hearing that it would have been "more accurate" for Davis to have retrieved all amounts not used for testing and returned them to the exhibit before testing the reserve weight.

## II.  DISCUSSION

McKenzie contends that "[t]here are numerous concerns regarding the authenticity, reliability and trustworthiness of the evidence underlying Count 3 of the Indictment, specifically the assertion that the narcotic weighed in excess of 50 grams."[48]  He seeks a preliminary determination under Rule 104 of the Federal Rules of Evidence[49] as to whether Davis can testify at trial and urges the court to exclude his testimony under Rule 702.[50]  Specifically, McKenzie contends that the results of Davis' initial weighing of Exhibit 10 and his opinion that the lower weight obtained on reweighing was due to evaporation are unreliable, and that his testimony should therefore be precluded.

### A.    Legal Standard for Admissibility of Expert Testimony

Rule 702, which governs the admissibility of expert testimony, states: "If scientific,

---

[46]*Id.*, ¶¶ 7–9.

[47]*Id.*, ¶ 3 ("Since the reserve weight is 50.4 grams, and the net weight was alleged to be 54.3, there was a total of 3.9 grams consumed or not retained by chemist Davis.  Therefore, 2.22 grams (3.9-1.68=2.22) of material is not accounted for, other than as material that did not pass through the mesh screen").  The court concludes that Davis failed to account for only 2.16 grams of Exhibit 10.  Treuting conceded at the hearing that the test amounts reported by Davis totaled 1.7 grams, rather than 1.68.  (See Davis Decl. ¶ 4(a)–(j).)  Further, Davis merely approximated the amounts used for testing; did not account for material caught in the screen when the two portions of Exhibit 10 were combined (*id.*, ¶ 4(c)); and did not state whether an additional sample was taken from Exhibit 10 to perform the methanol wash (*id.*, ¶ 4(e)).

[48]Def.'s Motion at 2.

[49]Rule 104(a) states that "[p]reliminary questions concerning . . . the admissibility of evidence shall be determined by the court. . . ."

[50]Supp. Reply at 2–5.

technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702. In the seminal case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), the Supreme Court identified "a gatekeeping role for the [trial] judge," who must determine whether to admit or exclude expert evidence in accordance with Rule 702.

In fulfilling this gatekeeping role, the Ninth Circuit has cautioned that "care must be taken to assure that a proffered witness truly qualifies as an expert" under Rule 702 before allowing him to come "before the jury cloaked with the mantle of an expert." *Jinro America Inc. v. Secure Investments, Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). Thus, as a threshold matter, the court must determine whether a witness is "qualified as an expert by knowledge, skill, experience, training, or education." FED.R.EVID. 702; *see also Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("*Daubert II*") ("The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular scientific field. . .").

If an expert is qualified, the district court must then "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Daubert*, 509 U.S. at 589. The *Daubert* Court outlined a two-step test to be used in determining reliability and relevance. "First, the trial court must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002) (quoting *Daubert*, 509 U.S. at 592-93). "Second, the court must ensure that the proposed expert testimony is relevant and will serve to aid the trier of fact." *Id*. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) ("The gatekeeping inquiry must be 'tied to the facts' of a particular 'case,'" quoting *Daubert*, 509 U.S. at 591).

To provide guidance for district courts performing the gatekeeping function, the *Daubert* Court identified a non-exclusive list of factors that should ordinarily be considered in evaluating the validity of an expert's scientific reasoning: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community. *Id.* at 593-94. The Court emphasized that the analysis is a "flexible" one, and that its "overarching subject" is the "evidentiary relevance and reliability . . . of the principles that underlie a proposed submission." *Id.* at 594-95. "The focus" of the inquiry, the Court noted, "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595.[51] Because of the flexible nature of the inquiry, "the trial judge must have considerable leeway in deciding . . . how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Kumho Tire Co.*, 526 U.S. at 152. See also *id.* at 153 ("[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine"). Ultimately, the district court must determine "whether th[e]

---

[51]Following *Daubert*, there was substantial debate as to whether its holding was limited to scientific testimony, or extended to testimony based on "technical" and "other specialized knowledge" as well. See FED.R.EVID. 702. This question was answered definitively by the Supreme Court's decision in *Kumho Tire Co.*  526 U.S. at 148 (the district court's "basic gatekeeping obligation . . . applies to all expert testimony"). Thus, whether an expert's knowledge is scientific, technical, or specialized, the court must determine if "the factual basis, data, principles, [or] methods" that underlie the testimony "ha[ve] 'a reliable basis in the knowledge and experience of the [relevant] discipline.'" *Id.* at 149. In making this assessment, the court "may" consider the factors set forth in *Daubert* to the extent they are pertinent in evaluating the reliability of the testimony being offered. See *id.* at 150 ("Our emphasis on the word 'may' thus reflects *Daubert*'s description of the Rule 702 inquiry as 'a flexible one.'. . . *Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.'. . . '[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.'. . . [M]uch depends upon the particular circumstances of the particular case at issue").

particular expert ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Id.* at 156.  Thus, it must inquire not whether the expert's basis for forming an opinion can generally be used, but whether it is properly employed in the particular case. *Id.* at 156–57.

The party seeking to admit expert testimony bears the burden of making a *prima facie* showing that the evidence is admissible under *Daubert*. *Lust By and Through Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) ("It is the proponent of the expert who has the burden of proving admissibility").  See also *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002) ("In addition, we note that '[t]he burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence,'" quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)); *United States v. Froelich*, 9 Fed. Appx. 654, 656 (9th Cir. May 18, 2001) (Unpub. Disp.)  ("[U]nder *Daubert*, the tendering party must make a *prima facie* case as to admissibility under Federal Rule of Evidence 702.  A review of the record shows that Froelich did not make a particularized showing as to reliability of the methodology and testing in this case; rather, Froelich's tender only referenced the general subject of reliability of polygraph theory untethered to the methods used in this case (citation omitted)); *United States v. Williams*, 95 F.3d 723, 729 (8th Cir. 1996) ("It is the burden of the party offering the expert testimony to lay a foundation for its admission").

### B.      Whether Davis' Proposed Testimony is Admissible under Rule 702

As noted in the court's March 5 order granting defendant's request for a *Daubert* hearing, the government has made a *prima facie* showing of the admissibility of Davis' testimony based on his declaration and the exhibits attached thereto.[52]  Defendant does not challenge Davis'

---

[52]See Davis Decl., Exh. A (Curriculum Vitae of Todd H. Davis), Exh. B (Forensic Chemist Worksheet), Exh. C (DEA Laboratory Report), Exh. D (Forensic Chemist Worksheet), Exh. E (Laura M. Jones, Danielle K. Boudreau, and John Casale, *"Crack Cocaine": A Study of Stability over Time and Temperature*, 6 MICROGRAM JOURNAL, Numbers 3–4 (2008)).

qualifications[53] nor the relevance of his proposed testimony.   Rather, he asserts that Davis'

weighing of Exhibit 10 and his opinion that the weight of the drugs decreased over time due to

evaporation are unreliable.   Specifically, McKenzie contends (1) that the "testimony is not the

product of reliable principles and methods" and (2) that Davis has "not applied the principles and

method[s] reliably to the facts of this case."[54]

### 1.    Weighing of Exhibit 10 on July 8, 2008

Davis' declaration describes the process he used to weigh the narcotics on July 8, 2008.[55]

Using a Mettler Toledo balance, Davis first weighed the entire exhibit, including the heat-sealed

envelope in which it arrived.[56]  He then removed and examined the crack cocaine in the envelope,

and determined that it was neither too wet nor otherwise in a condition that would prevent

---

[53]The government, moreover, has established that Davis is qualified, based on his training and experience, to testify as an expert regarding the forensic analysis of narcotics.  A witness can be qualified as an expert through knowledge, skill, experience, training, or education, or some combination of these.  See *Friendship Heights Assoc. v. Vlastimil Koubek*, 785 F.2d 1154, 1159 (4th Cir. 1986) ("Rule 702 further provides that a witness may be qualified as an expert on the grounds of 'knowledge, skill, experience, training, or education . . . .'  [T]he use of the disjunctive indicates that a witness may be qualified as an expert on any one of the five listed grounds").   "[A] trial court has wide discretion in determining whether a witness is qualified to testify as an expert."  *People v. Cepeda*, 851 F.2d 1564, 1566 (9th Cir. 1988).  Davis has been employed as a forensic chemist at the Drug Enforcement Administration's ("DEA") Southwest Laboratory since January 2006.  (Davis Decl., ¶ 2.)  When he was first hired by the DEA, he received approximately twelve months of training regarding DEA procedures and the evaluation of controlled substances.  Prior to joining the DEA, Davis was employed for ten years in the private sector as a scientist and research assistant in chemistry.  In 1997, he received a bachelor of science degree in microbiology from the University of California Santa Barbara with an emphasis in biochemistry.  Davis has testified as an expert in approximately ten state and federal trials.  (*Id*.)  Based on Davis' experience conducting forensic analyses of controlled substances for the DEA, his DEA training, formal education and prior experience, the court is satisfied that Davis is qualified to testify regarding the narcotics evidence at issue in this case.

[54]Supp. Reply at 2.

[55]Davis Decl, ¶ 4.

[56]*Id.*, ¶ 4(a).  Davis determined that the "gross weight" of Exhibit 10 including the evidence envelope was 82.9 grams.  (*Id.*)

testing.[57]  Davis next used the balance to weigh two new, unused ziplock bags.[58]  After placing the two pieces of crack cocaine comprising Exhibit 10 in separate bags, Davis weighed each bag containing narcotics separately.[59]  He subtracted the weight of the empty bags from the combined weight of the bags and narcotics to determine that the "net weight" of the narcotics was 54.332 grams.[60]

Davis subsequently used small portions of Exhibit 10 to perform nine tests confirming the composition of the narcotics.  After performing two tests on samples taken from each of the bags containing the narcotics (which confirmed that both contained cocaine), Davis ground the remaining narcotics with a mortar and pestle, passed the material through a small screen,  and combined the narcotics together.[61]  Davis estimated that he needed at least 1.7 grams of narcotics to complete his tests, but noted that he did not measure the amounts used for each test and that some material was lost when it became stuck in the metal screen or on the inside of the bags.[62]

---

[57]*Id.*, ¶ 4(c).

[58]*Id.*, ¶ 4(d).  Davis found that the two empty bags weighed .620 grams and .635 grams respectively.  (*Id.*)

[59]*Id.*, ¶ 4(e).  Davis found that the two bags weighed 28.119 grams and 27.468 grams respectively when containing the narcotics. (*Id.*)

[60]*Id.*, ¶ 4(f).

[61]*Id.* ¶ 5(c).

[62]*Id.* ¶ 5.  Davis estimates that he: (1) used 20 milligrams from each bag (40 milligrams total) to perform a chromatography mass spectrometer test; (2) used approximately 20 milligrams from each bag (40 milligrams total) to apply a color test solution; (3) ground the two portions of Exhibit 10 together, and passed the narcotics through a small screen, removing particles that were too large to fit through the screen; (4) removed approximately 1 gram from the now combined Exhibit 10 to test with an infrared spectrometer; (5) used a portion from the prior test and possibly an additional portion from Exhibit 10 to perform a methanol wash; (6) used approximately 500 milligrams to perform a uranyl acetate test; (7) used approximately 20 milligrams to perform a gas chromatography test; (8) used approximately 20 milligrams to conduct another chromatography mass spectrometer test; and (9) used approximately 120 milligrams to conduct a quantitative test to determine the amount of pure cocaine in the exhibit. (*Id.*)  This totally 1.74 grams.  At the hearing, Davis testified that this was a "low-ball estimate," as these were the

After completing additional tests on the narcotics, Davis reweighed the narcotics, using the same procedure he had employed at the beginning of his analysis. He weighed one new ziplock bag, placed the narcotics in the bag, weighed the filled bag, and subtracted the weight of the empty bag from the weight of the filled bag. He concluded that Exhibit 10's "reserve weight" was 50.46 grams.[63]  Based on his training, experience, and discussions with other DEA personnel, Davis asserts that the procedure he followed is that most commonly used by DEA forensic chemists to establish the net weight of narcotics exhibits.[64]  He reports that the rate of potential error of the weight measurements he took is +/− 0.01 grams.[65]

Among the non-exhaustive factors outlined in *Daubert* that can be considered in assessing the reliability of proposed expert testimony are: (1) whether the theory or technique can be, or has been, tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has been generally accepted by the scientific community.  509 U.S. at 593-94.[66]

The government contends that these factors support a finding that the method Davis used to weigh Exhibit 10 is reliable.[67]  As demonstrated by the fact that the drugs were later reweighed using the same procedure, it is clear that net weights obtained using the methodology Davis

---

minimum amounts needed to perform each test.  He also stated, as noted, that some of the narcotics was lost during the third step of the testing process because it became stuck in the screen.  (See *id.*, Exh. B.)

[63]*Id.*, ¶ 6.

[64]*Id.*, ¶ 4(g).

[65]Supp. Davis Decl., ¶ 2.

[66]As noted, while "a trial court may consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability," the test is a "flexible" one, and *"Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co.*, 526 U.S. at 141.  See also *Daubert*, 509 U.S. at 594-95.

[67]Supp. Opp. at 15–16.

15

employed can be tested.  While the basic weighing procedure does not appear to have been the subject of published articles, it is the procedure mostly widely used by DEA forensic chemists to determine the weight of narcotics, and was used, with immaterial variations, by defendant's expert, Dr. Treuting, as well.  Further, Davis' results were reviewed and approved by his supervisor.[68]  These facts suggest that the procedure Davis used has been adequately peer reviewed.  As for the procedure's potential error rate, Davis asserts that the balances used in the DEA lab are checked on a monthly basis by the DEA, calibrated on a yearly basis by an outside company, and taken out of service if there are any problems.[69]  Based on the weights obtained, the government contends that the potential rate of uncertainty is +/- 0.01 grams.[70]  Given that the procedure Davis used to weigh Exhibit 10 is that employed by most DEA chemists, and tracks that used by defendant's expert, it appears to have been widely accepted in the relevant scientific community.  Accordingly, the factors outlined in *Daubert* support a finding that Davis' methodology is reliable.

McKenzie contends that the following facts demonstrate the weighing was unreliable: (1) Exhibit 10 was not placed in the DEA evidence locker by Agent Fandino on the day it was seized; (2) a photograph of Exhibit 10 taken by DEA agents identifies the source of the narcotic as "Big O," the nickname of McKenzie's brother who was arrested as part of this investigation; (3) Davis' description of his testing fails to account for 2.2 grams of the crack cocaine; (4) Davis did not allow Exhibit 10 to dry before weighing it; (5) there are numerous cross-outs and corrections in Davis' lab records; and (6) Davis' test notes do not indicate when Exhibit 10 was opened.[71]  At oral argument, McKenzie's counsel also asserted that Davis' work "could have been done better" because (1) he did not weigh the amounts used during testing; (2) could not recall

---

[68]Davis Decl., ¶ 5(j).

[69]*Id.*, ¶ 4(b).

[70]Supp. Opp. at 16.

[71]Supp. Reply at 3–4.

16

why he had to correct his worksheets; and (3) did not remember whether he had adjusted the balance before weighing Exhibit 10.

None of these issues directly affects the reliability of the method Davis used to weigh Exhibit 10 or his application of the methodology in determining the weight of the drugs. Although defendant asserts that Davis should have let Exhibit 10 dry before weighing it, Davis testified that the narcotics were not wet when he first examined them. Whatever the amount used or lost during testing, moreover, it does not affect the accuracy of the weight measurements Davis took before or after testing. While Dr. Treuting testified that Davis' measurement of the reserve weight would have been "more accurate" had all of the narcotics not used for testing been returned to the exhibit, this does not suggest that the net weight calculation was inaccurate or that the difference between the net weight and reserve weight was inaccurate. Finally, Davis' inability to recall specific details of testing he performed in July 2008 does not suggest that he made errors in applying the procedures described. The facts McKenzie cites are potentially probative only of human error in handling the evidence prior to the time it was weighed, or in notes made to document the weighing procedure.

Circumstantial evidence of human error that might have affected the outcome of a test may alter the evidentiary weight to be given the test results, but it does not affect the test results' admissibility. See *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994) ("The impact of imperfectly conducted laboratory procedures might therefore be approached more properly as an issue not going to the admissibility, but to the weight of the . . . evidence"); see also *United States v. Beasley*, 102 F.3d 1440, 1448 (8th Cir. 1996) ("An allegation of failure to properly apply a scientific principle should provide the basis for exclusion of an expert opinion only if 'a reliable methodology was so altered . . . as to skew the methodology itself,'" quoting *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 858 (3d Cir. 1990)); *United States v. Williams*, CR 05-920-RSWL, 2008 U.S. Dist. LEXIS 105648, *49 (C.D. Cal. Dec. 23, 2008) ("Here, Defendant alleges various errors in the lab procedures, but he has not alleged any specific error in the testing for this case. These arguments are relevant to assess the weight of the evidence, but not its admissibility").

Simply arguing that the procedures "could have been done better" does not suggest a problem with the methodology employed. Because McKenzie has advanced no argument that the weight of the drugs recorded on July 11, 2008 was the result of tampering or use of faulty measurement procedures, there is no basis upon which to conclude that Davis' weighing of the drug on that date was unreliable. See *Daubert II*, 43 F.3d at 1318 (noting that the test for reliability "is not the correctness of the expert's conclusions but the soundness of his methodology").

## 2.     Davis' Opinion That the Subsequent Decrease in the Weight of Exhibit 10 Was the Result of Evaporation

Davis reports that he was not surprised that Exhibit 10 had decreased in weight during the fourteen month interval that passed between his first weighing of the narcotics and Exhibit 10's reweighing on September 21, 2009.[72] Davis notes that crack cocaine is made by mixing water with cocaine base and that the weight of the drug can decrease over time as the water evaporates.[73] He asserts that the forensic community universally accepts this theory, and cites an article supporting it that was published in a peer-reviewed journal by the DEA's foremost expert on cocaine.[74] Davis contends that this explanation for the decrease in the weight of the drugs is supported by the observations he made at the time Exhibit 10 was reweighed – i.e., that the inside of the container holding Exhibit 10 had moisture and a brown stain.[75]

The government asserts that the factors cited in *Daubert* support a finding that Davis' opinion regarding the cause of the decrease in weight is reliable. First, the theory has been tested and supported in an article published in a peer-reviewed journal. While the percentage decrease in weight appears to vary according to the composition of the narcotics and the circumstances

---

[72]Davis Decl., ¶ 9.

[73]*Id.*

[74]*Id.*; Exh. E (Laura M. Jones, Danielle K. Boudreau, and John Casale, *"Crack Cocaine": A Study of Stability over Time and Temperature*, 6 MICROGRAM JOURNAL, Numbers 3–4 (2008)).

[75]*Id.*

under which narcotics exhibits are stored, the general theory of evaporation causing a decrease in weight appears to be widely accepted in the forensic community. Indeed, defendant's expert agreed with this general point. Further, the government has cited several cases in which an expert's opinion that evaporation caused a decrease in the weight of crack cocaine has been admitted. See, e.g., *United States v. Watts*, 67 F.3d 790, 796 (9th Cir. 1995) ("The district court did not clearly err in determining that the offense of conviction involved more than 500 grams of crack. The drugs were weighed twice before trial, and each time they weighed significantly more than 500 grams. Although the weight of the drugs fell below 500 grams by the time of trial, expert testimony at trial established that the weight loss could be due to water loss. The government's chemist testified that the moisture in the crack could evaporate and escape as a vapor through small pores in the plastic bags which stored the crack. In light of [defendant's] failure to submit evidence contradicting this testimony, the district court's acceptance of the government's theory was not clearly erroneous"), rev'd on other grounds in *United States v. Watts*, 519 U.S. 148, 150 (1997); *United States v. Thomas*, 11 F.3d 620, 631–32 (6th Cir. 1993) (concluding, based on an expert opinion regarding the potential for evaporation over time, that the district court did not clearly err in finding that the weight of the crack cocaine a defendant distributed exceeded fifty grams, even though the drugs weighed under fifty grams when reweighed after seven months); see also *United States v. Dinkins*, No. 07-50377, 2009 WL 5032978, *1 (9th Cir. Dec. 23, 2009) (Unpub. Disp.) (affirming a conviction in a case where the weight of drugs decreased over time); *United States v. Briscoe*, 330 Fed. Appx. 384, 2009 WL 1510245, *3 (3rd Cir. June 1, 2009) (Unpub. Disp.) (holding that there was sufficient evidence to support a district court finding regarding the weight of crack cocaine where an expert "testified that crack cocaine loses weight over time due to water evaporating from the substance and that evaporation could occur even if the substance was stored in a heat-sealed package").

While McKenzie's expert disputes that evaporation accounts for all of the approximate 3.9 grams of weight loss, he does not dispute that evaporation can cause a decrease over time in the

weight of crack cocaine.[76]  Dr. Treuting merely states that, based on his experience, "it would be unusual for an approximately 50 gram amount of crack cocaine to lose 3.9 grams over 14 months while in a sealed evidence container."[77]  He also states notes that the percentage decrease here exceeds the decreases discussed in the study on which Davis relies.[78]  As noted, that study found up to a 5% decrease in weight in samples stored at room temperature.[79]  The study also used samples with a much higher concentration of cocaine than that found in Exhibit 10 in order to provide a "'best case' scenario for stability and weight loss."[80]

Treuting contends that it is customary for a chemist to note if evidence being weighed is unusually wet, and that Davis did not make such a notation at the time he originally tested the drugs.[81]  Davis, however, testified that he did not find Exhibit 10 to be wet when he first examined it.  Moreover, the study relied proffered by the government indicates that samples dried in advance of storage still lost weight over time.[82]  Finally, Treuting asserts that he did not see any indication of moisture or a stain on the evidence container when Exhibit 10 was reweighed in September 2009, and that Davis did not share his note regarding the stain with him that day.[83]

These points go to the weight of the evidence rather than its admissibility.  The Ninth

---

[76]Supp. Reply at 5.

[77]Treuting Decl., ¶ 4.

[78]*Id.*, ¶ 11.  ("The study demonstrates that over a 12 month period, there was a 2.1% weight loss of a freshly prepared sample when stored at room temperature in a heat sealed evidence envelope. . . .  The parentage weight loss of exhibit 10 was 7.6%, well over three times the weight loss of the contraband stored in similar conditions for a similar period of time in the study").

[79]Davis Decl., Exh. E at 117.

[80]*Id.* at 116.

[81]Treuting Decl., ¶ 14.

[82]Davis Decl., Exh. E.

[83]Treuting Decl., ¶¶ 7–9.

Circuit recently affirmed the conviction of a defendant for selling in excess of fifty grams of crack cocaine, where the drugs at issue were reweighed after initial measurement and found to have decreased in weight below fifty grams. *Dinkins*, 2009 WL 5032978 at *1. As the *Dinkins* court noted, the ultimate determination of the quantity of drugs involved in an offense turns on witness credibility. *Id.* ("Dinkins' own statements and the testimony of chemist Terry Caldwell regarding the quantity of cocaine base provide a reasonable basis for the district court to have concluded that Dinkins distributed 50 or more grams of cocaine base"). Additionally, evaporation has been offered as the explanation for larger decreases in weight than 3.9 grams over fourteen months. See, e.g., *Briscoe*, 2009 WL 1510245 at *2–3 (decrease of 4.1 grams over three months, from 51.5 grams to 47.4 grams); *Watts*, 67 F.3d at 796 (the weight of crack cocaine evidence dropped from 559 grams to 550 grams in a few weeks); *Thomas*, 11 F.3d at 631 (decrease of 4.1 grams over four months, from 53.6 grams to 49.5 grams).

While defendant may offer evidence and argue at trial that evaporation does not adequately explain the decrease in the weight of the drugs charged in count three, Treuting's testimony does not demonstrate that Davis' opinion is unreliable or that it should be excluded. See *Beasley*, 102 F.3d at 1448 ("An allegation of failure to properly apply a scientific principle should provide the basis for exclusion of an expert opinion only if 'a reliable methodology was so altered . . . as to skew the methodology itself,'" quoting *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d at 858).

## III.  CONCLUSION

Because defendant has not adduced evidence demonstrating that Davis' weighing procedure or his opinion that the decrease in the weight of the drugs was due to evaporation is unreliable, and because the arguments he advances go to the weight rather than the admissibility of Davis' anticipated testimony, defendant's motion to preclude Davis' testimony and related evidence that

he distributed more than fifty grams of a mixture or substance containing crack cocaine on May 28, 2008 is denied.

DATED: April 19, 2011

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE